UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

RAMON ANDERSON

CRIMINAL ACTION

NO. 11-147-BAJ-DLD

## RULING ON MOTION TO SUPPRESS

This matter is before the Court on a Motion to Suppress (doc. 10) and a
Supplemental Motion to Suppress (doc. 28) filed by the defendant, Ramon
Anderson ("Defendant").    Defendant seeks to suppress a firearm seized in
connection with an allegedly illegal stop of Defendant that occurred on
September 28, 2008.  The Government opposed the motion (docs. 12, 22, and
29).  Evidentiary hearings were held on March 14, 2012, and May 3, 2012, and
the parties have filed post-hearing briefs (docs. 42 and 43).  Alonda Young (Ms.
Young") and Corporal Neil Porter ("Corporal Porter"), of the Baton Rouge Police
Department ("BRPD"), testified on behalf of the Government.  Stacy Hilson ("Ms.
Hilson") testified on behalf of the defendant.

At the conclusion of the hearing, the Court asked the parties to submit
post-hearing briefs[1] to address the issues of: (1) whether Defendant violated any

---

[1]     At the suppression hearing, the Court ordered counsel to "confine the post-hearing brief
to six pages in length" (191:9-10) and "but, again, I would ask you to limit your arguments to six
pages in length" (192:1-3).  The Court notes that counsel for both sides disobeyed the Court's
order.  Defense counsel filed a 10-page brief, and counsel for the Government filed a 9-page

state laws which would have formed the basis of a legitimate stop; (2) whether the stop occurred in a high crime area; and (3) whether the stop and detention of Defendant was constitutional.

## Facts

Defendant alleges that on September 28, 2008, at 7:15 a.m., he was stopped by Corporal Porter and Corporal Jeremiah Ardoin ("Corporal Ardoin") of the Baton Rouge Police Department. The Government contends that the stop occurred no later than 6:45 a.m.

### I. Ms. Young's Testimony

At the hearing, Ms. Young, the custodian of records of the BRPD, testified regarding the information contained in a BRPD Computer Aided Dispatch ("CAD") system report that was admitted as United States Exhibit 1. According to the CAD report, the time of Defendant's stop was no later than 6:45 a.m., as the dispatcher began entering information pertaining to Corporal Porter's call at that time.[2] The Government contends that Corporal Porter stopped Defendant because he was in violation of La. R.S. 32:301, which required him to use his

---

brief. Neither counsel sought leave of court to file briefs in excess of the page limitation expressly imposed by the Court.

[2] Ms. Young testified that the CAD system uses computers to route calls to dispatchers. An officer will call the dispatcher and provide information such as identification and location, a license plate number, and whether assistance is needed. The dispatchers will then input the information into a computer – the time on which is automatically generated and synchronized to a federal government website every minute. The time shown on the CAD report refers to the time when the dispatcher begins inputting information. Ms. Young emphasized that neither date nor time is manually entered by the dispatchers.

headlights at any time between sunset and sunrise.[3]   Defendant provided information to the Court that, on the day of the stop, sunrise occurred at 6:57 a.m. (United States Ex. "2"/Defendant's Ex. "A"), and the Government stipulated to the information contained in the meteorological report.

The Court finds both the CAD report and Ms. Young's supplemental testimony credible and reliable, and, therefore, finds that the stop of Defendant occurred no later than 6:45 a.m.  As such, the Court holds that Defendant was stopped prior to sunrise.

## II. Corporal Porter's Testimony

At the hearing, Corporal Porter testified to the following facts:

He has been employed by the Baton Rouge City Police Department for ten years, but is currently on a desk duty due to a shoulder injury.  Despite the stop of Defendant occurring nearly four years prior to the suppression hearing, Corporal Porter recalled the stop and arrest of Defendant.  However, he noted that he stops "way too many [vehicles] to count" in a year (Hr'g Tr. 119:19-22).

---

[3]       La. R.S. 32:301 provides in pertinent part:

Every vehicle upon a highway within this state shall display lighted lamps and illuminating devices as hereinafter respectively required for different classes of vehicles subject to exception with respect to parked vehicles at any of the following times:

(1) At any time between sunset and sunrise.

(2) When, due to insufficient light or unfavorable atmospheric conditions, persons and vehicles on the highway are not clearly discernable at a distance of five hundred feet ahead.

In the early morning hours of September 28, 2008, Corporal Porter testified that he was patrolling the Scenic Highway area, a high crime area known for heavy prostitution, narcotics trafficking, shootings, and stolen vehicles where he had previously made several arrests. He was driving a marked police unit when he first observed Defendant's vehicle. Corporal Porter explained to the Court that he has made "several hundred arrests between narcotics, weapons, prostitution and all kind of stuff" in that area (131:5-8). Corporal Porter testified that he was traveling down Jessamine Avenue when his headlights illuminated a vehicle on the opposite side of the street—that was facing his vehicle—and was stopped in a lane of travel without its headlights on. He stated that "as soon as my headlights came on to the vehicle, the vehicle started moving towards me." (Hr'g Tr. 49:6-8).[4] Corporal Porter observed that even though the time of day was early morning, it was still "pitch black" (Hr'g Tr. 49:17).[5]

Corporal Porter testified that he noticed a male and female in the vehicle, which raised his suspicion, as the area is known as a high prostitution area. As soon as he activated his lights and siren to initiate the stop, the driver of the vehicle immediately "reached back behind the seat. I could see his body move to

---

[4]   Corporal Porter testified that he "found it suspicious that they [Defendant and his female passenger] were stopped on the side of the road in a completely dark part of the street in the lane of travel." (95:13-15).

[5]   When asked whether he encountered other vehicles that morning that had their headlights on, Corporal Porter answered in the affirmative (49:20-22).

the left and like his arm appeared to go back towards the back of where he was sitting at" (50:11-14). Despite the darkness outside, Corporal Porter explained that his headlights illuminated the inside of Defendant's vehicle, and he could see straight into the front seat through the windshield (76:14).[6] Corporal Porter was 15 to 20 feet from Defendant's vehicle, and driving about 10 or 15 miles per hour when he saw Defendant reach behind his seat (75:1-5). Corporal Porter described the vehicle as a black Ford truck, and the driver as the defendant.

After initiating the stop, Corporal Porter testified that he ordered Defendant to get out of the vehicle, and, as soon as Defendant got out of the vehicle, Corporal Porter noticed that Defendant's pants were "completely unzipped and open" (Hr'g Tr. 51:22). Corporal Porter stated that he then advised Defendant of his *Miranda* rights, asked Defendant to come back to the police vehicle, and engaged in a colloquy with Defendant. Because the area is known as a "prostitution hangout," Corporal Porter was concerned that "it could have possibly been a prostitution thing that got interrupted when my headlights hit the vehicle" (53:22-24). Corporal Porter testified that he asked Defendant if he knew the name of his female passenger, and Defendant responded in the negative, but

---

[6]     Ms. Hilson testified that Defendant's front windshield was not tinted (182:15-17).

that he "did not include that he did not know her name" in the police report (96:25). [7]

Corporal Porter testified that he asked Defendant why he had shoved his hand to the left side when his vehicle was stopped. He stated that:

> . . . from my actions out there and from, you know, my experience and training, most of the time they're trying to hide – I've found everything from somebody hiding guns, cocaine, money and alcohol containers. I've found a plethora of things that have been stuck behind seats when they see that they're' about to get stopped.

(55:16-22). Corporal Porter asserted that he asked Defendant why his pants were unzipped, and Defendant replied that he had forgotten to zip them. Corporal Porter also asked Defendant if there were any open containers, narcotics, or weapons in the vehicle. Defendant told him that there were not, and he gave the officer permission to search his vehicle. Corporal Porter testified that he asked to search the vehicle because:

> We run into guns all the time in that area. And through my experience, which for all my career except while I was in armed robbery, I've been in the First District. ***

---

[7]    When raised as an issue by the defense on cross examination, Corporal Porter testified that he did not include this information in the police report because "the reason I placed them under arrest was for the gun and not for prostitution" (123:12-14).

> And during that entire time, that area especially, has a lot of crime in that kind of aspect with narcotics and weapons. And when I saw his hand – his body move, like I've seen other types of people move, and I've later found a gun or marijuana or any kind of narcotics and stuff like that.
>
> ***
>
> When they're trying to make it to where I don't notice it. When they're –when my past experience, when they're more afraid of, oh, no, there's the cops, I better hide what I have on me because he's probably about to stop me, especially with my lights on.

(Hr'g Tr. 127:23-25; 128:4-20). Corporal Porter stated that he opened the rear vehicle door and observed a pistol sitting on the back seat of the driver's side.[8] Corporal Porter testified that he secured the firearm, and then began to question Defendant to determine if Defendant knew about the firearm. Corporal Porter testified that Defendant told him that the firearm belonged to a friend, and that he knew it was present in the truck.

Corporal Porter contacted the Criminal Investigations Unit ("CIU"), and learned that Defendant had a prior felony conviction in Mississippi for rape, which

---

[8] At the hearing, Corporal Porter testified that the rear door opened from the left side, so when both the driver's door and the rear driver's-side door were open, he had a very clear view of both seats (Hr'g Tr. 82:21-83:7). However, defense counsel produced a photograph of Defendant's vehicle which showed that the rear door opens from the right side (Defense Ex. 1). When asked by defense counsel if the vehicle in the photograph was Defendant's vehicle, Corporal Porter responded in the negative (84:25). Defense counsel asserted that the vehicle depicted in the photograph is, in fact, Defendant's vehicle that he was driving the night that Corporal Porter stopped him (85:15-86:11).

Despite Corporal Porter's inability to identify Defendant's vehicle, the Court finds Corporal Porter to be a credible and reliable witness. The Court notes that nearly four years has elapsed since the stop and detention at issue has occurred.

Defendant confirmed. Corporal Porter then arrested Defendant. His police report provides that the time of arrest was 7:20 a.m. The CAD report confirms that a towing service was called at 7:19 a.m. to tow Defendant's vehicle.

Corporal Porter testified that he also interviewed Defendant's female passenger, Ms. Hilson. She told officers that Defendant was giving her a ride to a Jack in the Box restaurant, and that she did not know Defendant's name, which also raised Corporal Porter's suspicions (Hr'g Tr. 65:4). Corporal Porter learned, through CIU's check of NCIC records, that Ms. Hilson was the subject of a warrant for her arrest. She was then immediately arrested. The CAD report reflects that at 7:35 a.m. Corporal Porter told the dispatcher that he was en route to District 1 with a female prisoner.

The Court finds Corporal Porter's testimony to be credible and reliable. In fact, much of his testimony was corroborated by both Ms. Young's testimony and the CAD report. The Court notes that there were, however, discrepancies in Corporal Porter's testimony, such as the times mentioned in his police report and the CAD report, and his inability to properly identify Defendant's vehicle. However, the Court attributes the difference in the time of day written in the police report versus the CAD report to the fact that Corporal Porter did not recall the exact time he stopped Defendant several days later when he actually prepared the police report. Corporal Porter testified that he did not review the CAD report when he prepared his police report, and that his practice was to

check his "watch whenever I advise somebody they're under arrest. And I try to time how long I'm sitting there with them. To – to begin the time of the stop" (Hr'g Tr. 67:4-7).

As mentioned, *supra*, the Court will attribute Corporal Porter's inability to properly identify Defendant's vehicle to two factors: (a) the almost four years that has elapsed since the stop of Defendant occurred, and (b) the hundreds of subsequent stops and arrests Corporal Porter has made in the interim.

### III. Ms. Hilson's Testimony

Ms. Hilson, Defendant's passenger, testified at the hearing to the following:

On the morning of September 28, 2008, Defendant picked her up from her sister's house, on N. 18th Street,[9] and they were "talking and going riding and whatever. And he asked – I asked him to take me to Jack in the Box" (Hr'g Tr. 145:10-12).[10] She testified 8 to 10 minutes had elapsed from when Defendant

---

[9]     N. 18th Street turns into Jessamine Avenue at Choctaw Drive. (Defendant's Ex. "2A"). Jack in the Box is a five or six block walk from that intersection (*Id*).

[10]     Hilson defined "going riding" as:

> We were just kind of going to ride to catch up. I hadn't seen him in a long time. We were just going to catch up.
> ***
> We had met like once or twice before, just friends.
> ***
> I can't recall exactly where did we first meet. It had been awhile since I had seen him.

(Hr'g Tr. 159:9-25).

picked her up to when the vehicle crossed Choctaw Drive, and she saw two police cars that were stopped and facing their direction near Chippewa Street.[11]

Ms. Hilson testified that it was daylight, and the police cars did not have their lights or sirens on (Hr'g Tr. 149:1-5). Ms. Hilson explained to the Court that she was wearing a seat belt, but that the Defendant was not, and Defendant grabbed for his seatbelt when they saw the police cars. Ms. Hilson testified that they were stopped just as they had crossed the intersection of Seneca and Jessamine Streets. After they were stopped one of the officers asked her if she knew the name of the vehicle's driver and she "told them Ramon Anderson" (155:24-25 – 156:1-3). Ms. Hilson asserted that she was not aware that the firearm was in Defendant's vehicle when she got in, and Defendant did not discuss the presence of the firearm with her.

The Court finds that Ms. Hilson's testimony is not credible for two reasons. Primarily, Ms. Hilson lied under oath. She testified that on the day Defendant was stopped and arrested, she was also arrested for an active bench warrant involving theft and forgery (Hr'g. Tr. 170:17-24). However, when asked by counsel for the Government if she had any prior convictions, Ms. Hilson explained that she was never convicted of "anything" (173:15-22). After the suppression hearing, the Government submitted certified minutes from the 19th

---

[11]    Hilson testified that it took them 8 to 10 minutes to drive two blocks because "the street stretches a little bit. You know, we were riding slow, we wasn't in a rush to go anywhere" (169:18-20).

10

Judicial District Court that reflect that on December 10, 2009, Ms. Hilson entered a plea of guilty to misdemeanor theft. The records further show that a forgery charge relating to the same incident was dismissed (*see* doc. 41 United States Ex. "A"). Secondly, Ms. Hilson admitted that on the day before the stop occurred she smoked marijuana and used "some" crack cocaine (Hr'g Tr. 186:14-25). Thus, because Ms. Hilson lied under oath and admitted that she used narcotics the day before the stop occurred, the Court finds that Ms. Hilson was not a credible witness and, therefore, will not accept her testimony as credible and reliable.[12]

## Analysis

### I. High Crime Area

In his Supplemental Motion to Suppress, Defendant asserts that when he was stopped by Corporal Porter, he was "riding in an area that was not considered to be a high-crime section of town" (doc. 28, p. 6). Corporal Porter testified, repeatedly, to the contrary, in that the area of town where he stopped Defendant is well-known as a high-crime area:

---

[12]     Moreover, Defendant's stop occurred in the early morning hours, and Ms. Hilson testified that she had not gone to sleep the night before.

Q.    Prior to the stop what were you doing, do you recall?

A.    Yes. I was patrolling an area of the city that has a high crime rate.

Q.    Okay. And can you explain what type of high crime?

A.    Everything from prostitution to drugs, shootings, stolen vehicles, just where a lot of stuff will typically happen at.

(Hr'g Tr. 48:2-8).

By the Court:        You described the area – let's see. As a high—as an area of a high crime rate; is that right?

By the witness:      Yes, Sir.

By the Court:        And you—and you've made other arrests in that area, I assume?

By the witness:      Oh, yes, sir.

(Hr'g Tr. 129:23-130:1-7).

By the Court:        And it's your testimony that you've made a number of previous arrests?

By the witness:      Oh, yes, sir. Prior to going to armed robbery, I mean, I made several hundred arrests between narcotics, weapons, prostitution and all kind of stuff back there.

By the Court:        Okay. Is that an area, to your knowledge, where the Baton Rouge Police Department and/or the sheriff's deputies have, let's say, added personnel and they placed – have they added more police officers or sheriff's deputies to that area?

By the witness:      Deputies, I don't know, sir. During that time many officers patrolled that area because there is a lot of complaints and stuff back there.

12

(Hr'g Tr. 131:1-25). Defendant did not present any evidence or testimony that would refute or controvert Corporal Porter's statements, but asserts that he was encountered by Corporal Porter on a:

> residential street; not in a seedy motel parking lot or a back alley or next to a crack house. The 2700 block of Jessamine is lined with single family units and people live, work, and conduct their daily lives from this block.

(Doc. 42, p. 4).

The Supreme Court has held that:

> An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a *Terry* analysis.

*Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000); *see also U.S. v. Rideau*, 969 F.2d 1572, 1575 (5th Cir. 1992) (noting that "when someone engages in suspicious activity in a high crime area, where weapons and violence abound, police officers must be particularly cautious in approaching and questioning him."). Therefore, the Court must make a determination as to whether the stop of Defendant occurred in a "high crime area."

13

The Fifth Circuit has not set forth specific factors for a district court to evaluate in making a high-crime area determination.[13] Moreover, the Fifth Circuit has not imposed a requirement that parties submit data regarding crime statistics in order to prove that an area is considered a high-crime area.

---

[13] However, In *U.S. v. Wright*, the First Circuit identified several factors for a district court to consider when making a factual finding of a high-crime area:

> In most cases, the relevant evidence for this factual finding will include some combination of the following: (1) the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case, *e.g., Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (noting that the area was not simply generally crime-ridden, but was particularly "known for heavy narcotics trafficking," where the defendant was suspected of drug activity); *United States v. Edmonds*, 240 F.3d 55, 60 (D.C.Cir.2001) (noting that the finding of a high crime area was supported by the similarity between the type of crime commonly found at that location and the type of crime for which the police suspected this defendant); (2) limited geographic boundaries of the "area" or "neighborhood" being evaluated, *e.g., United States v. Caruthers*, 458 F.3d 459, 468 (6th Cir.2006) (affirming a district court's finding of a high crime area, in part, because the evidence of frequent crime was specific to the exact intersection where the stop occurred); *United States v. Montero–Camargo*, 208 F.3d 1122, 1138 (9th Cir.2000) (en banc) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity."); and (3) temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue, *e.g., United States v. Bailey*, 417 F.3d 873, 874–75, 877 (8th Cir.2005) (affirming high crime area finding, in part, because of criminal activity during week prior to the stop at issue, occurring in same location as the stop). Evidence on these issues could include a mix of objective data and the testimony of police officers, describing their experiences in the area.

*United States v. Wright*, 485 F.3d 45, 53-54 (1st Cir. 2007).

The Court notes that on May 2, 2012, local media reported on a crime initiative intended to target crime in the 70805 zip code, "which police say is one of the city's highest crime areas." The article quoted Baton Rouge Mayor Kip Holden, who stated that, although "70805 only has a little more than 13 percent of the city's population, it accounts for 25 percent of our city's total police calls, 30 percent of our homicides and 40 percent of our gun assaults."[14] The map of the area where Defendant was stopped, submitted by Defendant as Defendant's Ex. 2A, reflects that the 2700 block of Jessamine Avenue is located within the 70805 zip code area.

The Court finds that Defendant's description of the 2700 block Jessamine Avenue mischaracterizes the nature of the crime in the area. The Court further finds that Corporal Porter's credible testimony, given under oath, describing the area where Defendant was stopped as a "high-crime area" is uncontroverted, and, therefore, the Court accepts it as true. As such, the Court finds that the area where Defendant stopped is a high-crime area.

## II. The Stop and Detention

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Traffic stops are deemed seizures for the purposes of the Fourth Amendment. *U.S. v. Lopez-Moreno,* 420

---

[14] *See* Press Release from City of Baton Rouge "Officials Launch Baton Rouge Area Violence Elimination Project – Local Version of Operation Ceasefire Kick Off in Zip Code 70805" May 2, 2012.

F.3d 420, 430 (5th Cir. 2005). The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under the two-part *Terry* reasonable suspicion inquiry, the Court must determine whether the officer's action was: (1) "justified at its inception"[15]; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 19–20.

### A. Justified at its Inception

Considering the first prong of the *Terry* analysis, the Fifth Circuit had held that "for a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *U.S. v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). The Supreme Court has instructed that in making a reasonable suspicion inquiry, a court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The Fifth Circuit has held that "reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences

---

[15] The issue of whether the stop was justified was primarily discussed in Defendant's first motion to suppress. This issue will hinge on a finding of fact of whether the sun had risen at the time of Defendant's stop.

from those facts, reasonably warrant the search and seizure." *Lopez-Moreno*, at 430.

In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. *Arvizu*, 534 U.S. at 274. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. *Terry*, 392 U.S. at 27. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause. *Arvizu*, 534 U.S. at 274.

In a recent opinion, the Fifth Circuit discussed the issue of whether a traffic stop is justified at its inception. *U.S. v. Raney*, 633 F.3d 385 (5th Cir. Feb. 10, 2011). The Fifth Circuit noted that "if the alleged traffic violation forming the basis of the stop was not a violation of state law, there is no objective basis for justifying the stop." *Id.*, at 340. The Fifth Circuit articulated that:

> The government bears the burden of proving that the stop was constitutional when, as here, the stop and search were conducted without a warrant. Thus, the suppression hearing provided the government the opportunity and obligation to present evidence establishing the validity of the traffic stop.

*Raney*, 633 F.3d at 392.

Defendant asserts that, "when considering the totality of the circumstances, the act of driving less than one block without headlights in early morning dawn does not reasonably amount to a traffic violation" (doc. 42, p. 3). To support his argument, Defendant asserts that he proceeded for less than one

17

block without headlights before he was stopped by Corporal Porter. The Government has set forth evidence that Defendant's traffic stop occurred no later than 6:45 a.m., and both parties have agreed that sunrise occurred at 6:57 a.m. on the day of the stop.

The Fifth Circuit has instructed that the "'controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.'" *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir. 1990) *quoting United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974). The Court finds, by a preponderance of the evidence, that Defendant's stop occurred on or before 6:45 a.m. As such, Defendant was stopped prior to sunrise. Therefore, the Court finds that Defendant was in violation of La. R.S. § 32:301, which required him to use his headlights at any time between sunset and sunrise. Accordingly, Corporal Porter had reasonable suspicion to stop Defendant for a traffic violation, and, therefore, the stop of Defendant was justified at its inception.

### B. Reasonable Suspicion of Criminal Activity

It is settled Fifth Circuit law that an officer can lawfully continue a detention if he has a "reasonable suspicion supported by articulable facts that a crime has been or is being committed." *U.S. v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002). "If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he

18

may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *U.S. v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) *opinion modified on denial of reh'g,* 622 F.3d 383 (5th Cir. 2010) *cert. denied,* 131 S. Ct. 620, 178 L. Ed. 2d 450 (U.S. 2010) and *cert. denied,* 131 S. Ct. 620, 178 L. Ed. 2d 450 (U.S. 2010).

The central issue before the Court is whether Corporal Porter had reasonable suspicion that Defendant was engaged in criminal activity. The Government argues that reasonable suspicion was, *inter alia,* created by: (1) Defendant's sudden arm movement when Corporal Porter initiated the stop; (2) Defendant's pants were unzipped and open; (3) Defendant's vehicle was stopped in a lane of travel for no apparent reason and his passenger was a woman; (4) Defendant was in a high prostitution area very early in the morning; and (4) the area is known as a high crime area.

Defendant asserts that, because: (1) he honestly answered all of the officers' questions; (2) the officers verified that the truck was properly insured and registered to Defendant; (3) they did not detect that Defendant was inebriated or anxious; and (4) his passenger did not give a conflicting statement to the officers, the officers should have issued Defendant a citation for his traffic violation and allowed him to leave because they "lacked any articulable suspicion that additional criminal activity had occurred." (Doc. 28, p. 4). Defendant further asserts that his explanation for his unzipped pants and for his sudden arm

19

movements were reasonable. Defendant also highlights the fact that there are several inconsistencies in Corporal Porter's testimony.

The Supreme Court and Fifth Circuit have "emphasized that courts must allow law enforcement 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *U.S v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) *quoting U.S. v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750-51, 1510 L.Ed.2d 740 (2002). The Fifth Circuit noted that:

> . . . we do not presume to prescribe in the abstract the scope of questioning, investigative techniques, or length of permissible detention that may be undertaken following a valid traffic stop. The bounds of existing caselaw are clear, if fact-intensive: a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop."

*Brigham*, 382 F.3d 500, 512 (5th Cir. 2004).

For the reasons stated, *supra*, the Court has determined that Corporal Porter's testimony is credible and reliable. As such, the Court finds that Defendant's alleged prolonged detention was not unconstitutional. The facts and circumstances surrounding the stop of Defendant and his subsequent detention were based on Corporal Porter's reasonable suspicions, which he articulated before this Court. At the time of Defendant's stop, Corporal Porter testified that

he had 8 years of experience, and was familiar with the area, having worked there for at least 5 years prior.

On the witness stand, Corporal Porter specifically detailed each fact that gave rise to his suspicions. The fact that he was patrolling a high-crime area, well-known for prostitution, very early in the morning, when he observed Defendant's vehicle parked in a lane of traffic without its lights on, and noticed that Defendant had a female passenger initially caused him to be suspicious, and justified further investigation. After Corporal Porter initiated a lawful traffic stop, and Defendant made a recognizably suspicious arm-movement, Corporal Porter had more than a mere hunch that criminal activity could be afoot. Upon Defendant exiting his vehicle with his pants open and zipper completely unzipped, and neither Defendant nor his female passenger being able to identify each other by name, Corporal Porter was justified in detaining Defendant. Moreover, Defendant consented to a search of his vehicle, during which Corporal Porter quickly found the firearm.

Defendant's assertions that Corporal Porter did not have reasonable suspicion to detain him because he honestly answered all of the questions and did not appear inebriated or nervous are overwhelmingly outweighed by the suspicious circumstances detailed in Corporal Porter's testimony. While Defendant's explanation for his unzipped pants (he forgot to zip them after he used the restroom) and sudden arm movement (he was trying to attach his

seatbelt) may seem plausible, the totality of the suspicious circumstances here offset Defendant's explanation.

As such, for the reasons detailed in this ruling, Defendant's motion to suppress will be denied.

### Conclusion

Accordingly, the Court concludes that the firearm recovered by Corporal Porter during the lawful stop will not be suppressed.

For the foregoing reasons, the motion to suppress (doc. 10) and the supplemental motion to suppress (doc. 28), filed by Defendant, are hereby **DENIED**.

Baton Rouge, Louisiana, May **31**, 2012.

_____
BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA